# In the United States Court of Federal Claims

No. 17-1804C
(Filed:  December 10, 2018)

**************************************

| | |
|---|---|
| HOUSING AUTHORITY OF THE CITY OF NEW HAVEN et al., | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |

RCFC 12(b)(1); RCFC 12(b)(6); Housing Act of 1937; Public Housing Authorities; Moving to Work Demonstration Program; Section 9 Operating Subsidy; 2012 Appropriations Act; Allocation Adjustment; Money-Mandating Source of Law; Presumption That Money Damages Are Available for Breach of Contract

**************************************

Carl A.S. Coan, III, Washington, DC, for plaintiffs.

A. Bondurant Eley, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

Plaintiffs in the above-captioned case are public housing authorities that participate in the United States Department of Housing and Urban Development's ("HUD") Moving to Work ("MTW") demonstration program.  In 2012, Congress provided that public housing authorities with excess operating reserves would receive an allocation adjustment to partially offset the operating subsidies to which they were otherwise contractually entitled pursuant to HUD guidelines.  Plaintiffs allege that although they did not have excess operating reserves, they improperly saw their operating subsidies reduced by an allocation adjustment as a result of their status as MTW program participants.  They seek relief on breach-of-contract and statutory grounds, and assert entitlement to approximately $22.4 million in damages plus attorney's fees and costs.

Defendant moves to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") and, alternatively, failure to state a claim upon which this court can grant relief pursuant to RCFC 12(b)(6).  As explained below, the court lacks jurisdiction to consider plaintiffs' statutory claims, but possesses jurisdiction over plaintiffs' breach-of-contract claim.  Further, plaintiffs have stated a plausible claim to relief under their breach-of-contract theory.  Accordingly, the court grants in part and denies in part defendant's motion to dismiss.

## I. BACKGROUND

### A. Statutory and Regulatory Framework

Congress created the federal public housing program when it passed the United States Housing Act of 1937 ("1937 Act").[1]  The purposes of the 1937 Act are to "assist States and political subdivisions of States to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families" and to "address the shortage of housing affordable to low-income families."  42 U.S.C. § 1437(a)(1) (2012).  The federal government advances these objectives through local public housing authorities.[2]  Id. § 1437(a)(1)(C).  A public housing authority is "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of public housing."  Id. § 1437a(b)(6)(A).

Under Section 8 of the 1937 Act, as amended ("Section 8"), HUD "is authorized to enter into annual contributions contracts with public housing [authorities] pursuant to which such [organizations] may enter into contracts to make assistance payments to owners of existing dwelling units in accordance with [42 U.S.C. § 1437f]."  Id. § 1437f(b)(1).  Section 8 thus benefits low-income families through rent subsidies paid directly to landlords.  Id. § 1437f(a).  The housing choice voucher program administered pursuant to Section 8 is "the federal government's major program for assisting very low-income families, the elderly, and the disabled to afford decent, safe, and sanitary housing in the private market."  Housing Choice Vouchers Fact Sheet, U.S. Dep't of Hous. & Urban Dev., https://www.hud.gov/program_offices/ public_indian_housing/programs/hcv/about/fact_sheet (last visited Dec. 10, 2018) [https://web.archive.org/web/20181210161151/https://www.hud.gov/program_offices/ public_indian_housing/programs/hcv/about/fact_sheet].

Section 9 of the 1937 Act, as amended ("Section 9"), also assists low-income families by allowing HUD to "make annual contributions to public housing [authorities] to assist in achieving and maintaining the lower income character of [public housing authority] projects."[3]  42 U.S.C. § 1437c(a)(1).  Tenants living in public housing authority projects must generally

---

[1]  The facts in this section—which are undisputed for the purpose of resolving defendant's motion to dismiss—derive from the complaint, the parties' submissions (including attached exhibits), and matters of which the court may take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence.  See Rocky Mountain Helium, LLC v. United States, 841 F.3d 1320, 1325-26 (Fed. Cir. 2016).

[2]  The relevant statutes and regulations generally refer to "public housing agencies" rather than "public housing authorities."  The distinction is purely semantic.  Since the parties refer to such organizations as "public housing authorities," the court uses that term as well.

[3]  HUD may also award grants to public housing authorities for the purpose of constructing public housing projects pursuant to forty-year contracts.  42 U.S.C. § 1437c(a)(2).  Such development grants are not at issue in the instant case.

qualify as "low-income" and pay monthly rent (to the public housing authority that owns the project) in an amount that is limited by their monthly income, which must be reviewed annually (or every three years for families on fixed incomes). Id. § 1437a(a)(1). A "project" is "housing [that is] developed, acquired, or assisted" by a public housing authority, including "improvement of any such housing." Id. § 1437a(b)(1). Congress provided that HUD "shall embody the provisions for [Section 9] annual contributions in a contract guaranteeing their payment." Id. § 1437c(a)(1) (emphasis added). These contracts are known as annual contributions contracts. E.g., Compl. Ex. 3 at 1. Pursuant to HUD regulations, an "annual contributions contract" is:

> a contract prescribed by HUD for loans and contributions, which may be in the form of [an] operating subsidy, whereby HUD agrees to provide financial assistance and the [public housing authority] agrees to comply with HUD requirements for the development and operation of its public housing projects.

24 C.F.R. § 990.115 (2008).

Congress established two sources of funds to accomplish its public housing objectives under Section 9: the Capital Fund and the Operating Fund. 42 U.S.C. § 1437g(c)(1). The purpose of the Capital Fund is to "mak[e] assistance available to public housing [authorities] to carry out capital and management activities." Id. § 1437g(d)(1). The purpose of the Operating Fund is to "mak[e] assistance available to public housing [authorities] for the operation and management of public housing." Id. § 1437g(e)(1). HUD must allocate annual appropriations to both the Capital Fund and Operating Fund among eligible public housing authorities based on statutory formulas. Id. § 1437g(c)(1); see also id. § 1437g(d)(2) (describing the "formula for determining the amount of assistance provided to public housing [authorities] from the Capital Fund for a fiscal year"), (e)(2) (describing the "formula for determining the amount of assistance provided to public housing [authorities] from the Operating Fund for a fiscal year"). Plaintiffs' claims in the instant case involve disbursements from the Operating Fund for the 2012 fiscal year.[4]

To implement the statutory requirements pertaining to the Operating Fund, HUD issued regulations that are codified in part 990 of title 24 of the Code of Federal Regulations ("part 990"). As relevant here, an "operating subsidy" is the "amount of annual contributions for operations a [public housing authority] receives each funding period under [Section 9] as

---

[4] The federal government's fiscal year runs from October 1 through the following September 30. 31 U.S.C. § 1102 (2012). The "2012 fiscal year" is the fiscal year ending September 30, 2012. Glossary Term: Fiscal Year, United States Senate, https://www.senate.gov/reference/glossary_term/fiscal_year.htm (last visited Dec. 10, 2018) [https://web.archive.org/web/20180924163127/https://www.senate.gov/reference/glossary_term/ fiscal_year.htm]. However, Congress's 2012 fiscal year appropriations funded public housing authorities for the 2012 calendar year. HUD has distributed operating subsidies for all public housing authorities on a calendar-year funding basis since 2005. Revisions to the Public Housing Operating Fund Program, 70 Fed. Reg. 54,984, 54,993 (Sept. 19, 2005).

determined by the Operating Fund Formula." 24 C.F.R. § 990.115. A public housing authority is eligible to receive an operating subsidy in an amount equal to the excess of its "formula expense" over its "formula income." Id. § 990.110(a)(2). Formula income is an estimate of the public housing authority's income exclusive of any operating subsidy, and is measured by the rent charged to tenants and the length of time for which units are leased. Id. § 990.195(a). Formula expense is the "costs of services and materials needed by a well-run [public housing authority] to sustain the project . . . such as administration, maintenance, and utilities." Id. § 990.160(a). The regulations provide that "HUD shall make monthly payments equal to 1/12 of a [public housing authority's] total annual operating subsidy under the formula." Id. § 990.210(a) (emphasis added). However, since the payment of operating subsidies is limited by congressional appropriations, id. § 990.110(b)(3), the regulations also provide that HUD may "revise, on a pro rata basis, the amount of operating subsidy to be paid" to public housing authorities when "insufficient funds are available,"[5] id. § 990.210(c) (emphasis added).

## B.  The Moving to Work Demonstration Program

In 1996, Congress approved the MTW demonstration program to allow public housing authorities the

> flexibility to design and test various approaches for providing and administering housing assistance that:  reduce cost and achieve greater cost effectiveness in Federal expenditures; give incentives to families with children where the head of household is working, seeking work, or is preparing to work by participating in job training, educational programs, or programs that assist people to obtain employment and become economically self-sufficient; and increase housing choices for low-income families.

Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1996 ("1996 Appropriations Act"), Pub. L. No. 104-134, § 204(a), 110 Stat. 1321, 1321-281. As part of that flexibility, MTW program participants are allowed to combine Section 9 operating funds with Section 8 assistance funds "to provide housing assistance for low-income families . . . and services to facilitate the transition to work on such terms and conditions as the [public housing authority] may propose and [HUD] may approve." Id. § 204(b), 110 Stat. at 1321-282. As relevant here, HUD may not reduce the Section 9 operating subsidies of MTW program participants as a result of their participation in the MTW program. Id. § 204(f), 110 Stat. at 1321-283.

---

[5]  Previously, HUD had "complete discretion to revise, on a pro rata or other basis established by HUD, the amounts of operating subsidy to be paid" to public housing authorities in the event that Congress did not appropriate sufficient funds for all operating subsidies to be paid in full. 24 C.F.R. § 990.112(c) (2001). That regulation was replaced by 24 C.F.R. § 990.210 effective November 18, 2005. Revisions to the Public Housing Operating Fund Program, 70 Fed. Reg. 54,984, 55,004 (Sept. 19, 2005).

To become an MTW program participant, a public housing authority (having previously entered into an annual contributions contract with HUD) must execute a standard MTW agreement memorializing the terms of its participation in the program; the agreements—which include specified attachments A, B, C, and D—are identical for each participant except with respect to Attachment A ("Calculation of Subsidies") and the optional Attachment D ("Legacy and Community-Specific Authorizations"). Pls.' Opp'n Def.'s Mot. Dismiss ("Opp'n") App. 67-68 (providing a June 29, 2018 printout of a HUD website describing the standard MTW agreement). See generally Compl. Ex. 3 (providing a complete copy of the standard MTW agreement, including attachments, executed by plaintiff Cambridge Housing Authority ("Cambridge")); Compl. Ex. 4 (providing a complete copy of Attachment A to the standard MTW agreement for the remaining plaintiffs). In 2008, HUD executed twenty-nine standard MTW agreements with public housing authorities. Opp'n App. 67.

Although they are provided with certain flexibility, public housing authorities participating in the MTW program remain subject to applicable law. Compl. Ex. 3 at 2-3. In particular, section I.C of the standard MTW agreement provides:

> This Restated Agreement only waives certain provisions of the 1937 Act and its implementing regulations. Other federal, state[,] and local requirements applicable to public housing shall continue to apply notwithstanding any term contained in this Restated Agreement or any Authorization granted thereunder. Accordingly, if any requirement applicable to public housing, outside of the 1937 Act, contains a provision that conflicts or is inconsistent with any authorization granted in this Restated Agreement, the MTW [program participant] remains subject to the terms of that requirement. Such requirements include, but are not limited to, the following: Appropriations Acts, competitive HUD notices of funding availability under which the [public housing authority] has received an award, state and local laws, Federal statutes other than the 1937 Act, and [others].

Id. MTW program participants agree, among other requirements, to:

- use any HUD assistance received under the MTW program in accordance with the public housing authority's annual plan;

- ensure that at least 75% of families served qualify as "very low-income families";

- assist at least as many eligible low-income families that it would assist if not participating in the MTW program;

- maintain a "comparable mix" of families, according to size, that it would assist if not participating in the MTW program;

- ensure that its public housing projects are "safe, decent, sanitary, and in good repair"; and

- submit financial and other data, including annual plans, reports, and audits.

Id. at 3-5, 9-12.

With respect to funding, section II.A of the standard MTW agreement provides:

> The amount of assistance received under sections 8 or 9 of the 1937 Act by [a public housing authority] participating in the demonstration shall not be diminished by the [public housing authority's] participation in the MTW demonstration.

Id. at 3.  The standard MTW agreement contains additional funding provisions:

> During the term of the MTW demonstration, HUD will provide the [public housing authority] with public housing operating subsidies . . . as provided in Attachment A.  If the [public housing authority's] Attachment A does not describe the funding methodology for any of these funding streams, the [public housing authority's] funding will be calculated according to standard HUD calculations of [public housing authority] benefits.
>
> . . . .
>
> The [public housing authority] may use [the operating subsidy] for any activity permissible under Section 9(e)(1) of the 1937 Act or, if the [public housing authority] proposes to use the funding as part of a block grant in its Annual MTW Plan, it may use these funds for any eligible activity permissible under Section 8(o), 9(d)(1), and 9(e)(1) [of the 1937 Act] consistent with this MTW Restated Agreement.

Id. at 7 (emphasis added).  Annual reports by MTW program participants must include a listing of planned versus actual sources and uses of funds, and may also include "planned [versus] actual reserve balances at the end of the plan year."  Compl. Ex. 3 Attach. B at 6.

MTW program participants are subject to default provisions for failure to correct deficiencies identified by HUD "within a reasonable period of time," material misrepresentations, use of funds for purposes not authorized in the MTW agreement, noncompliance with applicable requirements (including failure to timely submit required reports), and material breach of the agreement.  Compl. Ex. 3 at 5, 12-13.  Public housing authorities found to be in default are subject to the withholding of funds, forced reimbursement

-6-

of improperly used funds, reductions or offsets to future funding, corrective action, and termination of the MTW agreement.  Id. at 5, 13.

### C.  Plaintiffs' MTW Agreements

Each of the seven plaintiffs is an MTW program participant that executed the standard agreement.[6]  Attachment A to the MTW agreements executed by plaintiffs Cambridge, Housing Authority of the City of New Haven ("New Haven"), Delaware State Housing Authority ("Delaware"), Housing Authority of the City of Pittsburgh ("Pittsburgh"), Housing Authority of Portland ("Portland"), and Seattle Housing Authority ("Seattle") contained identical language.[7]  Compl. Ex. 3 Attach. A; Compl. Ex. 4.[8]  It provided, with respect to Section 9 operating subsidies:

> During the term of the MTW demonstration, HUD will provide the [public housing authority] with operating subsidy . . . assistance as described below.
>
> . . . .
>
> Each year, the [public housing authority] will calculate [the] Operating Subsidy, in accordance with instructions provided by HUD.  . . .
>
> . . . .
>
> Each [public housing authority] will be subject to the same subsidy proration as non-MTW [public housing authorities].  Hence, if the Congress appropriates only 97 percent of [funding] eligibility, [a public housing authority] will receive only 97 percent of its block grant operating subsidy for that year.
>
> . . . .
>
> [A public housing authority] will submit a consolidated year-end financial statement for all MTW program activities and all other reports that HUD may require.

---

[6]  There were originally eight plaintiffs in this action.  On August 6, 2018, the District of Columbia Housing Authority voluntarily dismissed its claims pursuant to RCFC 41(a)(1)(A)(i).

[7]  Only the first page of Attachment A to New Haven's MTW agreement is contained within Exhibit 4 of plaintiffs' complaint.

[8]  Exhibit 4 to plaintiffs' complaint is not separately paginated.  Therefore, the court uses the numbers affixed by the court's electronic case filing system.

Compl. Ex. 3 Attach. A at 1, 3-4 (emphasis added).  Further, with respect to Section 8 assistance, Cambridge is permitted to utilize "[a]n amount equal to two months' program costs . . . from existing [public housing authority] reserves for use as project reserves for MTW-eligible units." Id. at 6.  Attachment A to plaintiff Orlando Housing Authority's ("Orlando") MTW agreement contained substantially similar language:

> HUD will provide the [public housing authority] with operating subsidy . . . assistance as described below.
>
> . . . The calculation of operating subsidy will continue in accordance with applicable operating subsidy formula law and regulations. . . .
>
> . . . .
>
> All funds programmed for MTW purposes will be recorded and drawn from MTW designated line items on relevant HUD forms.

Compl. Ex. 4 at 15 (emphasis added).

### D.  2012 Appropriations

On February 14, 2011, the White House released the President's budget for the 2012 fiscal year.  See generally Office of Mgmt. & Budget, Exec. Office of the President, Budget of the United States Government, Fiscal Year 2012 (2011).  In that budget, the President requested $3,961,850,000 for the Public Housing Operating Fund (down from $4.754 billion in 2010).[9] Id. at 97, A560.  At that time, the estimated total eligibility for public housing authorities' 2012 operating subsidies under the Operating Fund formula was $4.962 billion.  Id. at A560.  The President expected that his budget request of $3.962 billion plus $1 billion from public housing authorities' operating reserves would fully fund the estimated eligibility of public housing authorities, including those that were MTW program participants.  Id.  He explained that many public housing authorities were "holding significant operating reserves accumulated primarily from prior-year appropriations for the Operating Fund program" and that his budget would reduce funding allocations only to public housing authorities with  "more than sufficient (i.e., excess) reserve levels."  Id. at A561.  The President posited that all public housing authorities would "be able to maintain adequate reserve levels to protect against unforeseen circumstances" because only those with excess reserves would receive a reduced operating subsidy.  Id.  The proposed budget also provided that HUD would determine the amount, if any, of "excess reserves" of each public housing authority and that "if "sufficient reserve-level data" was

---

[9]  HUD was operating under a continuing resolution for 2011 when the President published his 2012 budget because Congress had not yet enacted a full-year 2011 appropriation. Office of Mgmt. & Budget, supra, at A560.  (Page A__  refers to a page number in the appendix.)

unavailable for one or more public housing authorities, then HUD could "make a pro rata reduction" to those public housing authorities, even if they were MTW program participants.  <u>Id.</u> at A560.

In anticipation of Congress enacting the President's budget, HUD issued, on September 26, 2011, Notice PIH 2011-055, Public Housing Operating Subsidy Calculations for Calendar Year 2012 ("2011 PIH Notice").  <u>See generally</u> Opp'n App. 60-65 (containing excerpts of the 2011 PIH Notice[10]).  HUD explained that it was providing public housing authorities with information regarding the 2012 operating subsidy and anticipated implementation procedures in advance of congressional action so that public housing authorities could "plan accordingly," while cautioning that "any allocation adjustment to the operating subsidy is subject to the language" contained in an appropriations bill.  <u>Id.</u> at 60.

As relevant here, HUD directed MTW program participants to submit standard documents with respect to operating subsidy eligibility.  <u>Id.</u> at 61.  HUD explained that after it determined each public housing authority's 2012 operating subsidy eligibility, it would then compute an allocation adjustment based on the public housing authority's operating reserves, which HUD defined as an "accumulation of funds" that included, among other amounts, "unspent operating subsidy"; "unspent tenant rent"; "other miscellaneous revenue, including program income that has expanded uses"; and "unrestricted, unspent insurance proceeds."  <u>Id.</u> at 62.  HUD defined excess operating reserves as any amount of total operating reserves exceeding (1) four months of operating expenses for public housing authorities with 250 or more public housing units and (2) six months of operating expenses for public housing authorities with 249 or fewer public housing units.  <u>Id.</u>  HUD specified the line items from required financial data schedules that it would use to compute operating reserves and noted that where data was unavailable, a public housing authority's allocation adjustment would be based on the "average amount of the eligibility reduction" for that public housing authority's "peer group."  <u>Id.</u> at 63-64.  Peer groups were based on the number of public housing units operated by a particular public housing authority:

| Group Size | Units |
|---|---|
| Extra Large | 10,000+ |
| Large | 1,250 – 9,999 |
| High Medium | 500 – 1,249 |
| Low Medium | 250 – 499 |
| Small | 50 – 249 |
| Very Small | 1 – 49 |

---

[10]  A complete copy of the 2011 PIH Notice, including all attachments, is available at https://www.hud.gov/program_offices/public_indian_housing/publications/notices/2011 (last visited Dec. 10, 2018) [https://web.archive.org/web/20181210160547/https://www.hud.gov/program_offices/public_indian_housing/publications/notices/2011].

Id. at 64.  HUD also stated that it would consider requests from public housing authorities to exclude a portion of an authority's reserves from the allocation adjustment calculation based on certain specified grounds (e.g., prior obligations of those reserves), none of which is relevant here.  Id. at 65.  Additionally, HUD indicated that it would only consider requests for exclusions when the exclusion would have a "material impact" on the final allocation adjustment, and that it would not consider requests for exclusions for a public housing authority "with fewer than 250 units that has less than or equal to six months of operating expenses held in reserve or $100,000, whichever is greater" (since such public housing authorities would not receive an allocation adjustment to begin with) or MTW program participants.  Id.  With respect to public housing authorities participating in the MTW program, HUD explained that, in lieu of calculating an allocation adjustment, HUD would instead reduce the operating subsidy by a percentage reflecting the "average reduction of the [public housing authority's] peer group."  Id.

Congress enacted the Department of Housing and Urban Development Appropriations Act, 2012 ("2012 Appropriations Act") on November 18, 2011, as part of an omnibus appropriations act.  Pub. L. No. 112-55, § 4, div. C, tit. II, 125 Stat. 552, 672-703 (2011).  The 2012 Appropriations Act provided:

### PUBLIC HOUSING OPERATING FUND

> For 2012 payments to public housing [authorities] for the operation and management of public housing . . . , $3,961,850,000 . . . :  Provided, That in determining public housing [authorities'], including Moving to Work [program participants'], calendar year 2012 funding allocations under this heading, [HUD] shall take into account public housing [authorities'] excess operating fund reserves, as determined by [HUD]:  Provided further, That Moving to Work [program participants] shall receive a pro-rata reduction consistent with their peer groups:  Provided further, That no public housing [authority] shall be left with less than $100,000 in operating reserves:  Provided further, That [HUD] shall not offset excess reserves by more than $750,000,000 . . . .

Id. at 680.  In other words, Congress provided the full $3.962 billion requested by the President, directed that MTW program participants would receive allocation adjustments in accordance with their peer groups rather than their operating reserve levels, set $100,000 as the minimum operating reserve level for all public housing authorities, and limited the aggregate allocation adjustments for all public housing authorities nationwide to $750 million.  In addition, Congress designated $20 million (out of the $3.962 billion) to assist public housing authorities that experienced "financial hardship" resulting directly from an allocation adjustment to its operating subsidy.  Id.

### E.  2012 Allocation Adjustments

Another judge of this court recently summarized HUD's implementation of the 2012 Appropriations Act with respect to public housing authorities' operating subsidies from the Operating Fund:

> HUD's implementation of the authority it was given under the 2012 Appropriations Act changed the methodology used for calculating the amount of operating subsidies to be paid to the [public housing authorities].  In prior years, pursuant to its regulations, HUD had reduced each [public housing authority's] operating subsidy payment by a uniform percentage that reflected the shortfall between the total amount Congress had appropriated and the total amount payable under the Operating Formula.  Because of the changes HUD made to comply with the [2012 Appropriations Act], however, the reduction of the [public housing authorities'] payments to account for the budget shortfall were not made on a pro rata basis.
>
> The process HUD employed to implement the reduction was as follows.  First, employing the Operating Formula set forth in its regulations to each [public housing authority], HUD determined that the aggregate formula amount to which the [public housing authorities] were entitled was $4,888,046,046.  Then, in accordance with the methodology set forth in the [2011] PIH Notice, it determined each [public housing authority's] excess operating reserves.  The aggregate amount of excess operating reserves so determined was $738,316,329.  HUD then subtracted the aggregate amount of the [public housing authorities'] excess operating reserves ($738,316,329) from the aggregate Operating Formula amount ($4,888,046,046).  Finally, it took the difference ($4,149,983,999) and compared it to the total amount Congress had appropriated for operating subsidies ($3,961,850,000).  It then arrived at the percentage (94.97%) which would be used to adjust the amount of the [public housing authorities'] subsidy payments so that HUD would remain within the $3,961,850,000 that Congress had appropriated to pay operating subsidies.[11]
>
> With that analysis complete, HUD went on to determine the operating subsidy payment each individual [public housing

---

[11]  The difference between $4,888,046,046 and $738,316,329 is $4,149,729,717.  The amount that Congress appropriated—$3,961,850,000—is 95.47% of the difference (either as corrected or as indicated in the quoted text) when rounding to two decimal places.  These discrepancies are not relevant to the outcome of this case.

authority] would receive.  As in previous years, the starting point
for this determination was each [public housing authority's]
eligibility amount under the Operating Formula.  But unlike in
previous years, HUD then made an "allocation adjustment" by
offsetting each individual [public housing authority's] excess
operating reserves against its Operating Formula eligibility
amount.  Finally, HUD then multiplied the adjusted amount by
94.97% to determine the payment each [public housing authority]
would actually receive (thus ensuring that HUD did not exceed the
Congressional appropriation).

Because the amount of excess operating reserves varied
from [public housing authority] to [public housing authority], so
did the percentage reduction in their Operating Formula eligibility
amounts.  [Public housing authorities] without excess operating
reserves received 94.97% of their formula eligibility while . . .
many [public housing authorities] experienced as much as a 100%
reduction in their operating subsidies below the amount derived
from application of the Operating Formula.

Pub. Hous. Auths. Dirs. Ass'n v. United States, 130 Fed. Cl. 522, 528 (2017) (footnote added)
(citations omitted).  In addition, in a December 16, 2011 report to Congress, HUD explained:

The calculation of operating reserves uses specific
Financial Disclosure Statement (FDS) line numbers to capture the
relevant revenue and expense components . . . .  HUD is unable to
determine reserve balances for [public housing authorities] that
participate in the [MTW] program given the flexibility that MTW
[public housing authorities] have to combine program funds
between both Section 8 Tenant Based Rental Assistance program
and Section 9 Public Housing funds.

Def.'s Mot. Dismiss ("Mot.") App. H at 3.

On June 8, 2012, HUD issued Notice PIH 2012-27, Calendar Year 2012 $20 Million
Set-Aside for Financial Hardship due to Public Housing Operating Subsidy Allocation
Adjustment ("2012 PIH Notice"), to provide information "to assist [public housing authorities]
who encounter financial hardship as a direct result of the subsidy allocation adjustment" for
2012.  Opp'n App. 77.  See generally id. at 77-81 (containing excerpts of the 2012 PIH Notice).[12]
However, MTW program participants were ineligible for such hardship assistance:

---

[12]  A complete copy of the 2012 PIH Notice, including all attachments, is available at
https://www.hud.gov/program_offices/public_indian_housing/publications/notices/2012 (last
visited Dec. 10, 2018) [https://web.archive.org/web/20181210154807/https://www.hud.gov/
program_offices/public_indian_housing/publications/notices/2012].

> Pursuant to [the 2012 Appropriations Act], MTW [program participants] were included in the calendar year 2012 funding allocation adjustment.  However, because of the flexibility MTW [program participants] have in using different funding sources to address operating expenses, all MTW [program participants] received a pro-rata allocation adjustment [based on] their peer group(s).  Given the fungibility of funding sources available to MTW [program participants], no determination of "hardship" can be made.  Therefore, MTW [program participants] are not eligible to receive funding from the $20 million set-aside for [public housing authorities] that encounter a financial hardship as a direct result of the allocation adjustment.[13]

Id. at 81 (footnote added).

Altogether, sixty-two public housing authorities received a 2012 operating subsidy allocation adjustment based on their peer group rather than operating reserve levels.  Id. at 82.  Thirty of these public housing authorities, including all seven plaintiffs, were MTW program participants; the remaining thirty-two did not submit sufficient financial data from which HUD could calculate the allocation adjustment.  Id.  Six of the seven plaintiffs were in the "Large" peer group, and the seventh—Delaware—was in the "High Medium" peer group.  Id.  HUD reduced plaintiffs' 2012 operating subsidies by the following allocation adjustments:

| Public Housing Authority | 2012 Allocation Adjustment |
|---|---|
| Cambridge | $1,539,580 |
| Delaware | $662,947 |
| New Haven | $2,436,667 |
| Orlando | $621,664 |
| Pittsburgh | $5,996,528 |
| Portland | $1,418,427 |
| Seattle | $2,800,102 |

Compl. ¶¶ 103 (New Haven), 105 (Delaware), 109 (Orlando), 111 (Cambridge), 113 (Portland), 115 (Pittsburgh), 117 (Seattle).

---

[13]  HUD did not use the full $20 million to alleviate financial hardship.  Approximately $4 million remained after all eligible public housing authorities received hardship assistance; these remaining funds were distributed ratably among all public housing authorities that received a 2012 operating subsidy.  Opp'n App. 97.

**F. Procedural History**

Plaintiffs filed suit in this court on November 16, 2017, alleging generally that the calculation of their allocation adjustments was improper because it did not take into account their operating reserves.  Specifically, plaintiffs allege that their operating reserves, including the amounts above which each plaintiff would have been considered to have excess operating reserves (i.e., the "excess threshold"), were as follows:

| Public Housing Authority | Operating Reserves | Excess Threshold |
|---|---|---|
| Cambridge | $3,519,192 | $6,693,292 |
| Delaware | −$289,829 | $1,148,910 |
| New Haven | $2,162,322 | $7,414,388 |
| Orlando | $2,066,651 | $3,098,603 |
| Pittsburgh | $9,732,726 | $20,067,834 |
| Portland | −$133,039 | $5,151,057 |
| Seattle | $3,897,436 | $7,817,214 |

Id.  In other words, plaintiffs contend that none of them had excess operating reserves.

Plaintiffs assert three counts in their complaint.  Count I, breach of contract, focuses on the nondiscrimination provision in section II.A of plaintiffs' MTW agreements.  Id. ¶ 102. According to plaintiffs, they each received a 2012 allocation adjustment based on their peer group, not the amount of their operating reserves, because of their status as MTW program participants, in violation of section II.A.  Plaintiffs also argue, in Counts II and III, that HUD violated the 2012 Appropriations Act.  In Count II, plaintiffs posit that a proper reading of the 2012 Appropriations Act would have allowed HUD to base 2012 allocation adjustments on peer groups rather than operating reserves only if HUD was unable to determine whether an MTW program participant had excess operating reserves, but instead HUD simply applied an "automatic pro-rata reduction" for all MTW program participants.  Id. ¶¶ 122-23.  In Count III, plaintiffs emphasize that even if HUD was permitted to calculate allocation adjustments based on peer groups, HUD ignored the provision that no public housing authority could be left with less than $100,000 in operating reserves.  Id. ¶¶ 128-29.  Plaintiffs request damages in the amount of their allocation adjustments plus attorney's fees and costs.

Defendant moved to dismiss plaintiffs' complaint on April 18, 2018, emphasizing that the MTW agreements and the 2012 Appropriations Act are not money-mandating and that, in any event, plaintiffs seek relief that this court lacks jurisdiction to grant and to which plaintiffs are not entitled under any law or contract.  Oral argument was not requested, and the court deems it unnecessary.  Defendant's motion is now ripe for adjudication.

-14-

## II.  DEFENDANT'S RCFC 12(b)(1) MOTION TO DISMISS

### A.  Standard of Review

Defendant first moves to dismiss plaintiffs' complaint for lack of subject-matter jurisdiction pursuant to RCFC 12(b)(1).  In determining whether subject-matter jurisdiction exists, the court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  The plaintiff bears the burden of proving, by a preponderance of evidence, that the court possesses subject-matter jurisdiction.  Id.  If jurisdictional facts are challenged, the court is not limited to the pleadings in determining whether it possesses subject-matter jurisdiction to entertain a plaintiff's claims.  Banks v. United States, 741 F.3d 1268, 1277 (Fed. Cir. 2014); Pucciariello v. United States, 116 Fed. Cl. 390, 400 (2014).  If the court finds that it lacks subject-matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

### B.  Subject-Matter Jurisdiction

Whether the court possesses jurisdiction to decide the merits of a case is a threshold matter.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); see also Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006) (explaining that subject-matter jurisdiction cannot be forfeited or waived because it "involves a court's power to hear a case" (citing United States v. Cotton, 535 U.S. 625, 630 (2002))); Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583 (1999) ("[A] federal court [must] satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case."), quoted in Hymas v. United States, 810 F.3d 1312, 1316-17 (Fed. Cir. 2016); Matthews v. United States, 72 Fed. Cl. 274, 278 (2006) (stating that subject-matter jurisdiction is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case").  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall) 506, 514 (1868).  Either party, or the court sua sponte, may challenge the court's subject-matter jurisdiction at any time.  Arbaugh, 546 U.S. at 506.

The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued."  United States v. Sherwood, 312 U.S. 584, 586 (1941).  The waiver of immunity "cannot be implied but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).  The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States, not sounding in tort, that are founded upon the United States Constitution, a federal statute or regulation, or an express or implied contract with the United States.  28 U.S.C. § 1491(a)(1) (2012).  However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages."  United States v. Testan, 424 U.S. 392, 298 (1976).  Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been

violated, or an express or implied contract with the United States." Lovelades Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).

### C. Plaintiffs' MTW Agreements With HUD Are Money-Mandating

Plaintiffs first assert that this court has jurisdiction to entertain their breach-of-contract claim because their MTW agreements are money-mandating. Specifically, plaintiffs rely on section II.A of those agreements, which they describe as "an anti-discrimination provision that prohibits any diminution in the subsidies Plaintiffs receive from HUD because of their status" as MTW program participants. Compl. ¶ 102. Defendant counters that plaintiffs' MTW agreements "cannot be fairly interpreted as mandating the payment of money damages for a breach." Mot. 19. Despite the parties' disagreement with the import of the contractual provision, nevertheless, the parties therefore do not dispute, and the court agrees, that the MTW agreements are express contracts.[14]

It is well understood that "[c]ontract law is a separate source of law compensable under the Tucker Act" and that in a typical contract case, "the presumption that money damages are available satisfies the Tucker Act's money-mandating requirement." Higbie v. United States, 778 F.3d 990, 993 (Fed. Cir. 2015); accord Griffin & Griffin Expl., LLC v. United States, 116 Fed. Cl. 163, 171 (2014) ("Claims for damages arising out of a contract with the United States are squarely within the express terms of the Tucker Act."). However, that presumption can be overcome because not all contracts are money-mandating for Tucker Act purposes. Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1343 (Fed. Cir. 2008). Contracts that "expressly disavow[] money damages," plea agreements in criminal cases, and cooperative agreements are not money-mandating contracts. Holmes v. United States, 657 F.3d 1303, 1314 (Fed. Cir. 2011). In other words, when the "underlying claim is . . . for equitable relief" rather than "a free and clear transfer of money," the suit is not for "presently due money damages" under the Tucker Act and thus the Court of Federal Claims would lack jurisdiction to entertain it. Lummi Tribe of the Lummi Reservation v. United States, 870 F.3d 1313, 1319 (Fed. Cir. 2017).

Defendant argues that the MTW agreements "cannot fairly be interpreted as contemplating money damages in the event of breach because Congress has explicitly provided that the relationship between HUD and the [public housing authorities] exclusively involves the provision of restricted-use funds, not money damages" and therefore the "unrestricted money damages that plaintiffs now seek . . . are neither contemplated nor authorized by Congress." Mot. 25-26 (citation and internal quotation marks omitted). Plaintiffs' contrary view is that "contracts with the United States are presumed to have a remedy of money damages upon a

---

[14] To the extent that plaintiffs' breach-of-contract claim is rooted in statutory and regulatory obligations, those statutes and regulations must actually be incorporated into the contracts at issue. Kennedy Heights Apartments, Ltd. I v. United States, 48 Fed. Cl. 574, 577-78 (2001). There does not appear to be any dispute, and the court agrees, that the relevant statutory and regulatory provisions are indeed incorporated into plaintiffs' MTW agreements. Of course, whether a statute or regulation is money-mandating is of no moment in determining whether the contract into which it is incorporated is itself money-mandating.

breach of the contract, unless the parties to the contract provide otherwise," unlike the other bases for Tucker Act jurisdiction (i.e., constitutional, statutory, or regulatory).  Opp'n 13.  They emphasize that they "are not seeking any equitable or prospective relief," id. at 17, because "[m]oney damages will make Plaintiffs whole," id. at 22.

Both sides rely heavily upon <u>Holmes</u> to support their position.[15]  In <u>Holmes</u>, the plaintiff sought compensatory damages based on allegations that his former employer violated two Title VII settlement agreements by failing to remove adverse information from his employment file, thus preventing him from obtaining subsequent employment.  657 F.3d at 1308, 1310.  The United States Court of Appeals for the Federal Circuit ("Federal Circuit") held that although the settlement agreements at issue arose from litigation under the "comprehensive scheme" of Title VII, the plaintiff's suit was, at bottom, "a suit to enforce a contract with the [federal] government" and thus "not <u>per se</u> beyond the Tucker Act jurisdiction of the Court of Federal Claims."  Id. at 1312.  The Federal Circuit then turned to the dispute concerning whether the plaintiff was required to show that the settlement agreements at issue were money-mandating given that they were express contracts.  Id.  After reviewing the jurisprudence distinguishing between (1) contractual claims and (2) constitutional, statutory, and regulatory claims, id. at 1313-14, the Federal Circuit explained that "in a contract case, the money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption that money damages are available for breach of contract, with no further inquiry being necessary."  Id. at 1314.  However, as the Federal Circuit remarked, that presumption is not automatic because not all contracts involve money damages.  Id.  The Federal Circuit found that the Court of Federal Claims did not err in requiring the plaintiff, under the unique circumstances of that case, to demonstrate that the contracts at issue were money-mandating because "settlement of a Title VII action involving the government could involve purely nonmonetary relief."  Id. at 1315.

Here, as in <u>Holmes</u>, plaintiffs rely on an express contract—in the instant case, the standard MTW agreement—to establish Tucker Act jurisdiction.  Section II.A of that agreement, which specifies that funding to a public housing authority may not be reduced on account of its participation in the MTW program, pertains solely to public housing authority funding.  Other language in plaintiffs' MTW agreements—including, but not limited to, Attachment A—pertains to funding as well.  <u>See supra</u> Sections I.B-C.  Thus, unlike in <u>Holmes</u>, it is not plausible that resolution of a dispute regarding these provisions "could involve purely nonmonetary relief."  The only relief that will make plaintiffs whole under the facts as alleged in their complaint is money damages, even if that relief is severely restricted.

_____

[15]  Defendant also relies on several other decisions in support of its motion to dismiss plaintiffs' breach-of-contract claim.  These decisions, however, generally address statutory claims rather than breach-of-contract claims.  In particular, defendant relies extensively on <u>Lummi</u> in arguing that plaintiffs' contract claim is outside of the court's jurisdiction because it is effectively a statutory claim based on the 2012 Appropriations Act, which itself is not money-mandating (according to defendant).  Plaintiffs emphasize that <u>Lummi</u>—unlike the instant case—did not involve a contract.  The court agrees that <u>Lummi</u> is sufficiently distinguishable from the instant case with respect to plaintiffs' breach-of-contract claim.

Further, plaintiffs are not seeking any other form of relief.[16]  Their breach-of-contract claim is not merely a disguised equitable claim because, in the context of this case, an order of specific performance (e.g., enforcing section II.A of plaintiffs' MTW agreements) or an injunction (e.g., enjoining HUD from violating section II.A) would be equivalent to an order requiring the payment of funds owed to plaintiffs.[17]  To the extent that plaintiffs' breach-of-contract claim could be characterized as one for specific performance or as a request for an injunction, it is of no moment.  The availability of monetary relief to make plaintiffs whole forecloses the possibility of equitable relief.  Restatement (Second) of Contracts § 359(1) (Am. Law Inst. 1981).

In other words, the circumstances under which a plaintiff in a breach-of-contract case must affirmatively demonstrate that the contract at issue is indeed money-mandating—i.e., that purely nonmonetary relief could be appropriate—are not present here.  See Higbie, 778 F.3d at 993-94.  There is also no indication that monetary damages are unavailable (for example, because of an express disclaimer).  See Mata v. United States, 107 Fed. Cl. 618, 623 (2012); Brizuela v. United States, 103 Fed. Cl. 635, 639 (2012).  Therefore, defendant cannot overcome the presumption that money damages are available as a remedy for plaintiffs' breach-of-contract claim.

In short, the court has jurisdiction to consider Count I of plaintiffs' complaint and grant the requested relief if plaintiffs carry their burden of proof.

### D.  The 2012 Appropriations Act Is Not Money-Mandating

In addition to asserting entitlement to relief under a breach-of-contract theory, plaintiffs assert that this court has jurisdiction to entertain their statutory claims because the 2012 Appropriations Act is money-mandating.  "A statute or regulation is money-mandating for jurisdictional purposes if it can fairly be interpreted as mandating compensation for damages sustained as a result of the breach of the duties it imposes."  Ferreiro v. United States, 501 F.3d 1349, 1351-52 (Fed. Cir. 2007) (citations and internal quotation marks omitted).  The determination of whether a statute is money-mandating is made pursuant to a two-part test:

---

[16]  With some exceptions not relevant to the case at bar, the Court of Federal Claims generally lacks the ability to award equitable relief.  See Bowen v. Massachusetts, 487 U.S. 879, 905 (1988) (holding that the Court of Federal Claims lacks the "general equitable powers of a district court to grant prospective relief"); Brown v. United States, 105 F.3d 621, 624 (Fed. Cir. 1997) (holding that the Tucker Act does not provide independent relief through declaratory or injunctive judgments); Stephanatos v. United States, 81 Fed. Cl. 440, 445 (2008) (explaining that the Court of Federal Claims "has no authority to grant equitable relief 'unless it is tied and subordinate to a money judgment'" (quoting James v. Caldera, 159 F.3d 573, 580 (Fed. Cir. 1998))).

[17]  Defendant does not argue that plaintiffs' breach-of-contract claim could be characterized as one for specific performance or a request for an injunction.

> First, the court determines whether any substantive law imposes
> specific obligations on the Government.  If that condition is met,
> then the court proceeds to the second inquiry, "whether the
> relevant source of substantive law can be fairly interpreted as
> mandating compensation for damages sustained as a result of the
> breach of the duties the governing law imposes."

Samish Indian Nation v. United States, 657 F.3d 1330, 1335 (Fed. Cir. 2011) (quoting United States v. Navajo Nation, 556 U.S. 287, 291 (2009)), vacated in part on other grounds, 568 U.S. 936 (2012) (mem.).  In other words, "to satisfy the jurisdictional requirements of the Tucker Act, a plaintiff must point to an independent, substantive source of law that mandates payment from the United States for the injury suffered."  Johnson v. United States, 105 Fed. Cl. 85, 91 (2012); accord Samish, 657 F.3d at 1335-36 ("The Court of Federal Claims has jurisdiction if the substantive law at issue is 'reasonably amenable to the reading that it mandates a right of recovery in damages.'" (quoting United States v. White Mountain Apache Tribe, 537 U.S. 465, 473 (2003))).

According to plaintiffs, the 2012 Appropriations Act is money-mandating because it contains clear standards for HUD to allocate appropriated funds among public housing authorities and those standards allowed HUD no discretion in doing so.  Specifically, plaintiffs contend that the 2012 Appropriations Act provided that HUD was supposed to "take into account whether a [public housing authority] had excess operating reserves" in computing allocation adjustments and "specifically applied this directive" to MTW program participants.  Compl. ¶ 121.  Further, plaintiffs assert that the 2012 Appropriations Act "directed that no [public housing authority], which includes MTW [program participants], should be left with less than $100,000 in operating reserves by the application of an allocation adjustment . . . even where an MTW [program participant] receives a pro-rata reduction based on its peer group."  Id. ¶¶ 128-29.  Defendant posits that the 2012 Appropriations Act "is plainly not money-mandating" because although it "generally deals with funding, it affords [HUD] discretion to allocate that funding among potential recipients."  Mot. 18.  Defendant remarks that the 2012 Appropriations Act "did not provide 'clear standards' for paying money to [public housing authorities], nor state the 'precise amounts' payable to them, nor compel payment upon 'satisfaction of [any] conditions.'"  Id. at 18-19 (second alteration in original) (quoting Samish, 657 F.3d at 1335).

Defendant relies primarily upon Samish in advancing its argument that the 2012 Appropriations Act is not money-mandating.  In Samish, the Federal Circuit explained:

> The money-mandating condition is satisfied when the text of a
> statute creates an entitlement by leaving the Government with no
> discretion over the payment of funds.  In limited situations, the
> money-mandating requirement may also be satisfied if the
> Government retains discretion over the disbursement of funds but
> the statute:  (1) provides clear standards for paying money to
> recipients; (2) states the precise amounts that must be paid; or
> (3) as interpreted, compels payment on satisfaction of certain

> conditions.  . . .  [T]he money-mandating analysis must train on
> specific rights-creating or duty-imposing statutory or regulatory
> prescriptions.

657 F.3d at 1336 (citations and internal quotation marks omitted).  The statutes at issue in
Samish provided the United States Bureau of Indian Affairs with considerable discretion in
spending appropriated funds, and failed to "provide a clear standard for paying money to
recognized tribes, state the amounts to be paid to any tribe, or compel payment on satisfaction of
certain conditions," leading the Federal Circuit to conclude that those statutes were not
money-mandating.  Id. at 1336-37.

The 2012 Appropriations Act provides HUD with discretion in the distributions of funds
because even though HUD was required to "take into account" each public housing authority's
excess operating fund reserves, those excess reserves were to be determined by HUD.
Moreover, the requirement that HUD simply "take into account" excess reserves, even when
coupled with the provision that no public housing authority be left with less than $100,000 in
operating reserves and the $750 million aggregate cap on allocation adjustments, is a far cry
from a clear standard.  Nor does the 2012 Appropriations Act specify discrete amounts to be paid
to any particular public housing authority for 2012 or compel payment upon the fulfillment of
certain conditions.

Plaintiffs argue, in opposition to defendant's motion to dismiss, that Section 9 and its
statutorily required implementing regulations (i.e., part 990) constitute money-mandating sources
of law.  Opp'n 29-30.  However, as plaintiffs emphasize, "Counts II and III of the Complaint are
based on HUD's violation of a money-mandating provision of the [2012 Appropriations Act]."
Id. at 26 n.22 (emphasis added).  Part 990 implements the relevant portion of Section 9—42
U.S.C. § 1437g—not the 2012 Appropriations Act.  24 C.F.R. § 990.100.  Accordingly,
plaintiffs' reliance on Section 9 and part 990 to establish jurisdiction over Counts II and III of
their complaint is inapposite.

In short, the Federal Circuit's holding in Samish makes clear that the 2012
Appropriations Act cannot be construed as a money-mandating statute for Tucker Act purposes,
and thus this court lacks jurisdiction to consider Counts II and III of plaintiffs' complaint.[18]

---

[18]   Allowing plaintiffs to amend their complaint to add a count for violation of Section 9
or part 990 would be superfluous.  Regardless of whether Section 9 or part 990 is
money-mandating, those provisions are incorporated into the plaintiffs' MTW agreements, and
the court has already determined it has jurisdiction to consider plaintiffs' claim for the breach of
those agreements.  See supra Section II.C.

### III.  DEFENDANT'S RCFC 12(b)(6) MOTION TO DISMISS

Having determined that it lacks subject-matter jurisdiction to consider plaintiffs' statutory claims, but has jurisdiction to consider plaintiffs' breach-of-contract claim, the court turns to defendant's alternative motion to dismiss plaintiffs' complaint for failure to state a claim upon which this court can grant relief pursuant to RCFC 12(b)(6).  The entirety of defendant's RCFC 12(b)(6) motion is as follows:

> Plaintiffs' complaint also fails to state a claim upon which relief can be granted because, to the extent that plaintiffs seek a money judgment without the strings attached, plaintiffs request relief to which they are not entitled under any law or contract with HUD, let alone [section 204 of the 1996 Appropriations Act], the 2012 Appropriations Act, and their respective MTW agreements. On this basis alone, the Court should dismiss plaintiffs' claims pursuant to RCFC 12(b)(6), if the Court does not first dismiss this suit for lack of subject-matter jurisdiction pursuant to RCFC 12(b)(1).

Mot. 26.  With respect to their breach-of-contract claim, the only claim that survives defendant's RCFC 12(b)(1) motion to dismiss, plaintiffs proclaim that they "have alleged facts that, if true, demonstrate that Defendant is liable for HUD's breach of the contracts between Plaintiffs and HUD when HUD discriminated against Plaintiffs by improperly reducing the operating subsidies to which Plaintiffs were entitled in 2012 based on their status as MTW [program participants]." Opp'n 32.

### A.  Standard of Review

A claim that survives a jurisdictional challenge remains subject to dismissal under RCFC 12(b)(6) if the claim does not provide a basis for the court to grant relief.  See Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002) (explaining that an RCFC 12(b)(6) motion to dismiss is "appropriate when the facts asserted by the claimant do not entitle him to a legal remedy").  To survive an RCFC 12(b)(6) motion to dismiss, a plaintiff must include in its complaint "enough facts to state a claim to relief that is plausible on its face" sufficient for the defendant to have "fair notice" of the claim and the "grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007) (internal quotation marks omitted).  In other words, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (referencing Twombly, 550 U.S. at 556).  In ruling on such a motion, the court must "accept as true all of the factual allegations contained in the complaint" and any attachments thereto.  Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (referencing Twombly, 550 U.S. at 555-56); accord RCFC 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."); Rocky Mountain, 841 F.3d at 1325 (applying RCFC 10(c) and emphasizing that "a court 'must consider the complaint in its

entirety, . . . in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice'" (quoting <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007))).

The issue at this stage of litigation is not the sufficiency of the defendant's potential defenses or the likelihood of the plaintiff's eventual success on the merits of its claims, but simply whether the plaintiff has alleged specific facts describing a plausible claim for relief.  <u>See</u> <u>Chapman Law Firm Co. v. Greenleaf Constr. Co.</u>, 490 F.3d 934, 938 (Fed. Cir. 2007) ("The court must determine 'whether the claimant is entitled to offer evidence to support the claims,' not whether the claimant will ultimately prevail." (quoting <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974))).

### B.  Plaintiffs State a Plausible Breach-of-Contract Claim

To prove a breach of contract, a plaintiff must establish "(1) a valid contract between the parties; (2) an obligation or duty arising from that contract; (3) a breach of that duty; and (4) damages caused by the breach."  <u>Century Expl. New Orleans, LLC v. United States</u>, 110 Fed. Cl. 148, 163 (2013) (referencing <u>San Carlos Irr. & Drainage Dist. v. United States</u>, 877 F.2d 957, 959 (Fed. Cir. 1989)).  Once a breach of contract is established, the burden shifts to the defendant to plead and prove affirmative defenses that excuse the breach.  <u>Shell Oil Co. v.</u> <u>United States</u>, 751 F.3d 1282, 1297 (Fed. Cir. 2014) (referencing <u>Stockton E. Water Dist. v.</u> <u>United States</u>, 583 F.3d 1344, 1360 (Fed. Cir. 2009)).

Although the parties agree regarding the existence of a contractual relationship between them, they disagree concerning the nature of their contractual duties and, consequently, whether one or more of those duties was breached.  As it must do at this stage of the proceedings, the court assumes the truth of plaintiffs' allegations.  Their MTW agreements prohibit HUD from treating MTW program participants differently than non-MTW public housing authorities with respect to funding.  However, pursuant to the 2012 Appropriations Act, which provided a different rule for making allocation adjustments to MTW program participants' operating subsidies, HUD did not treat plaintiffs in the same manner as it treated non-MTW public housing authorities.  HUD applied an allocation adjustment based on plaintiffs' peer groups rather than, as it did with the non-MTW public housing authorities, attempt to calculate plaintiffs' operating reserves and then determine whether there was any excess.  Plaintiffs allege that had HUD treated them the same as it treated non-MTW public housing authorities, HUD would have found that no plaintiffs had excess operating reserves, and thus none of them would have been subject to an allocation adjustment.  In short, plaintiffs allege that HUD's breach of the nondiscrimination provision of their MTW agreements caused them damages.  These allegations, if true, support a claim for breach of contract.

Defendant's argument regarding the fungibility of Section 8 and Section 9 funds for MTW program participants—i.e., that HUD could not compute the Section 9 operating reserves for MTW program participants because of their ability to combine Section 8 and Section 9 funds to achieve program goals—does not advance its position.  At this stage of the proceedings, the court assumes that HUD could have calculated plaintiffs' operating reserves and expenses

(including, if necessary, an aggregate figure for Section 8 and Section 9 funds) and thereby determine whether each plaintiff had excess operating reserves.[19]  Defendant's fungibility argument thus creates, at most, a genuine issue of material fact and thereby fails to clear the RCFC 12(b)(6) threshold.  See, e.g., Anchorage v. United States, 119 Fed. Cl. 709, 715 (2015) ("Because there is a genuine issue of material fact as to the duties of the parties under the [agreement], the Court must deny the [RCFC 12(b)(6)] Motion to Dismiss at this stage.").

In addition, defendant's contention that sections I.C and I.E of plaintiffs' MTW agreements operate to absolve defendant of any potential liability for breach-of-contract is unavailing for two reasons.  First, as plaintiffs observe, section I.E was deleted from the agreements in October 2008.  See Opp'n App. 69-76.  Second, as plaintiffs also observe:

> HUD was given authority . . . to waive only those statutory provisions in the 1937 Act, and not in other statutes or requirements.  [Section I.C] merely states the obvious, that both HUD and MTW [program participants] must comply with applicable law.  These extrinsic requirements, however, are not incorporated into the MTW Agreement.  A future statute, for example, can be a breach of the MTW Agreement even if the statute must be complied with by MTW [program participants] and HUD.

Opp'n 8.  Defendant does not challenge these observations.

In short, the court must deny defendant's RCFC 12(b)(6) motion to dismiss Count I of plaintiffs' complaint on its merits because plaintiffs have stated a plausible claim to relief under their breach-of-contract theory.  In addition, the court must deny defendant's RCFC 12(b)(6) motion to dismiss Counts II and III of plaintiffs' complaint as moot because the court lacks jurisdiction to entertain those claims.

---

[19]  This assumption easily meets the plausibility standard set forth in Twombly.  First, plaintiffs' MTW agreements contain provisions requiring them to provide HUD with extensive financial data, including "all other reports that HUD may require."  Further, because plaintiffs are allowed to utilize specified amounts of "program costs" from "existing reserves" for certain purposes, it is no stretch of the imagination to assume that such costs and reserves could indeed have been calculated.

## IV.  CONCLUSION

The court has considered all of the parties' arguments.  To the extent not discussed herein, they are unpersuasive, without merit, or unnecessary for resolving the issues currently before the court.

The court lacks jurisdiction to consider plaintiffs' statutory claims because the 2012 Appropriations Act is not money-mandating for Tucker Act purposes.  However, the court has jurisdiction to consider plaintiffs' breach-of-contract claim.  Further, plaintiffs have stated a plausible claim to relief under their breach-of-contract theory.

Therefore, the court **GRANTS IN PART** (with respect to Counts II and III) and **DENIES IN PART** (with respect to Count I) defendant's motion to dismiss for lack of subject-matter jurisdiction, and **DENIES IN PART** (with respect to Count I, on the merits) and **DENIES AS MOOT IN PART** (with respect to Counts II and III) defendant's alternative motion to dismiss for failure to state a claim upon which this court can grant relief.  Counts II and III of plaintiffs' complaint are **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter jurisdiction.  Defendant shall file its answer with respect to Count I of plaintiffs' complaint **no later than Friday, February 8, 2019**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge